November 17, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1575

IN RE: THINKING MACHINES CORPORATION,

Debtor.


THINKING MACHINES CORPORATION,

Appellee,

v.

MELLON FINANCIAL SERVICES CORPORATION #1,

Appellant.



ERRATA SHEET ERRATA SHEET

The opinion of this court issued on October 17, 1995, is
corrected as follows:

On page 2, line 13; page 6, line 24; page 7, line 2; page 13,
line 10; page 15, line 19; page 17, line 22 change " 
365(c)(3)" to " 365(d)(3)"

On page 7, line 11 change " 365(c)(4)" to " 365(d)(4)"

UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1575

IN RE: THINKING MACHINES CORPORATION,

Debtor.


THINKING MACHINES CORPORATION,

Appellee,

v.

MELLON FINANCIAL SERVICES CORPORATION #1,

Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge] 



Before

Selya and Stahl, Circuit Judges, 

and Gorton,* District Judge. 



Kevin J. Simard, with whom Charles R. Bennett, Jr. and 
Riemer & Braunstein were on brief, for appellant. 
Charles R. Dougherty, with whom Jonathan C. Lipson and Hill 
& Barlow were on brief, for appellee. 



October 17, 1995




*Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. This appeal compels us to SELYA, Circuit Judge. 

address a nagging question of bankruptcy law on which no court of

appeals has yet spoken and on which lower federal courts are

divided. The problem relates to the operation of section 365(a)

of the Bankruptcy Code, 11 U.S.C. 365(a) (1994), a statute that

permits a Chapter 11 trustee, subject to certain conditions, to

assume or reject any unexpired lease or executory contract in

existence on the date the insolvency proceeding commences.

Because the trustee's actions require court approval, and because

the Code treats nonresidential leases differently than other

leases or executory contracts, requiring the estate to continue

paying rent at the contract rate until rejection takes effect, 11

U.S.C. 365(d)(3), a question arises: Is court approval a

condition precedent or subsequent to the effective rejection of a

nonresidential lease pursuant to section 365(a)? This question

is of considerably more than academic interest. Time is money in

the waiting game that Chapter 11 often entails, and substantial

sums can ride on how quickly the trustee can jettison a high-

priced lease. In this case, for example, the determination of

which date controls carries with it a swing of approximately

$200,000.

The courts below disagreed on how the question should

be answered. The bankruptcy court ruled that the debtor's

rejection of its lease took effect only on court approval. See 

In re Thinking Machines Corp., 178 B.R. 31 (Bankr. D. Mass. 

1994). The district court reversed, holding that the rejection

3

was effective on the date that the debtor gave appropriate notice

of its decision to reject.1 See In re Thinking Machines Corp., 

182 B.R. 365 (D. Mass. 1995). Concluding, as we do, that the

statute is most propitiously read to make court approval a

condition precedent to an effective rejection of a nonresidential

lease, we now reverse.

I. BACKGROUND I. BACKGROUND

The material facts are undisputed. In 1990, Thinking

Machines Corporation ("TMC" or "the debtor") leased a building in

Cambridge, Massachusetts, from Mellon Financial Services

Corporation #1 ("Mellon"). Apparently, the environs were not

sufficiently conducive to fertile thought, for, on August 17,

1994, TMC filed a voluntary petition seeking relief under Chapter

11 of the Code, 11 U.S.C. 1101-1145. TMC proceeded to operate

the business as a debtor in possession. It continued to occupy

the demised premises, using only a fraction of the space. On

September 13, 1994, TMC filed a motion asking the bankruptcy

court to approve its decision to reject the lease. The court

granted the motion on October 4.

Three weeks later, Mellon moved for immediate

possession of the premises and payment of $345,915.89
 

1This date is sometimes called, in bankruptcy parlance, the
"motion filing date." The label refers to the requirement that
the trustee or debtor in possession must signify an election to
accept or reject a particular lease by the filing of a motion to
that effect in the bankruptcy court. See Fed. R. Bankr. P. 6006, 
9014. Mindful of the pithy advice that St. Ambrose is reputed to
have offered St. Augustine ("When you are at Rome live in the
Roman style."), see Jeremy Taylor, Ductor Dubitantium, I, I, 5 
(1660), we shall employ this terminology.

4

(representing administrative rent accrued at the contract rate

through the date on which the bankruptcy court had approved the

debtor's rejection of the lease, plus associated expenses). TMC

parried this thrust by touting the motion filing date as the

effective date of its rejection (and, therefore, the outer

boundary of its liability under the lease). It also tendered to

Mellon $143,326.45 (the amount due under the lease through the

motion filing date).

The bankruptcy judge resolved the dispute in Mellon's

favor, ruling that the rejection did not take effect until the

court had approved it, and that, accordingly, the debtor owed

Mellon $210,150.26 (the difference between the total amount due

under the lease through October 4 and the partial payment

previously made by the debtor) plus interest and common area

maintenance charges.2 See Thinking Machines, 178 B.R. at 34. 

When TMC appealed, the district court took a different slant. It

held that the rejection occurred on September 13, 1994 (the

motion filing date), and that, therefore, no further payments

were due. See Thinking Machines, 182 B.R. at 369. This appeal 

ensued.

II. STANDARD OF REVIEW II. STANDARD OF REVIEW

We afford plenary review to determinations of law made

by a district court sitting in appellate review of a bankruptcy

 

2We note an $80 discrepancy between the bankruptcy court's
judgment and the total claimed arrearage. This appears to be
traceable to the court papers. We do not pursue the point,
confident that any necessary adjustment can be made on remand.

5

court order, ceding no special deference to the district court.

See, e.g., In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 

73 (1st Cir. 1995); In re G.S.F. Corp., 938 F.2d 1467, 1474 (1st 

Cir. 1991); In re Navigation Technology Corp. 880 F.2d 1491, 1493 

(1st Cir. 1989). This standard is fully applicable here, as it

is in all cases in which we are asked to decipher the meaning of

a statute. See, e.g., In re Jarvis, 53 F.3d 416, 419 (1st Cir. 

1995); United States v. Holmquist, 36 F.3d 154, 158 (1st Cir. 

1994), cert. denied, 115 S. Ct. 1797 (1995); United States v. 

Gifford, 17 F.3d 462, 472 (1st Cir. 1994). 

III. ANALYSIS III. ANALYSIS

We organize our analysis in three segments, dealing

with the statutory framework, the time when the rejection of a

nonresidential lease becomes effective under that framework, and

the implications of our exercise in statutory construction on the

calculus of relief.

A. The Statutory Framework. A. The Statutory Framework. 

Section 365(a) states, with exceptions not relevant

here, that "the trustee, subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. 365(a).3 This proviso furnishes the

trustee with a multipurpose elixir for use in nursing a business
 

3For ease in reference, we discuss the issue in terms of
trustees. We recognize, however, that under Chapter 11 a debtor
in possession has essentially the same rights, powers, and duties
as a trustee, see 11 U.S.C. 1107(a), 1108, including the right 
under 365(a) to assume or reject a nonresidential lease. Thus,
our comments and conclusions, context permitting, are equally
applicable to debtors in possession.

6

back to good health. On one hand, the trustee may prescribe the

elixir as a tranquilizer to ease the fears of squeamish suppliers

and customers so that they will continue doing business with a

bankrupt corporation. On the other hand, the trustee may

prescribe it as an emetic to purge the bankruptcy estate of

obligations that promise to hinder a reorganization.

Having originally given Chapter 11 trustees broad

latitude in dispensing the elixir, Congress subsequently diluted

the potion. Since section 365(a), as initially enacted,

contained no temporal boundaries within which a trustee had to

assume or reject an unexpired lease, and did not require debtors

to pay rent at the contract rate while the trustee equivocated,

commercial landlords felt themselves unfairly disadvantaged

because, unlike other creditors, they were forced to continue

extending credit to the debtor during the pendency of the

reorganization proceeding. See 130 Cong. Rec. 20084, 20088 

(daily ed. June 29, 1984), reprinted in 1984 U.S.C.C.A.N. 590, 

598-99 (statement of Sen. Hatch). Whether or not love of money

is the root of all evil, it is at the least a powerful motivator.

Spurred by financial self-interest, the landlords lobbied

successfully for passage of the so-called Shopping Center

Amendments (the "S/C Amendments") as part of the Bankruptcy

Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353,

98 Stat. 333.

The S/C Amendments alter the equation in two

significant respects. First, they direct the trustee, in a

7

timely fashion, to "perform all the obligations of the debtor . .

. under any unexpired lease of nonresidential real property,

until such lease is assumed or rejected." 11 U.S.C. 365(d)(3).

This provision requires the trustee, inter alia, to pay rent 

under the lease at the contract rate unless and until he rejects

it, and gives the landlord what amounts to a preference in the

form of an administrative claim for such avails. Thus, section

365(d)(3) is a marked departure from the tenet, reflected

throughout the Code, that post-petition administrative expenses

should be allowed only for "actual, necessary costs and expenses

of preserving the [bankruptcy] estate." 11 U.S.C. 

503(b)(1)(A). Second, if the trustee fails to take a position in

regard to the lease within sixty days from the date of the order

for relief under Chapter 11 (or within such longer period as the

court, on application, may fix), the lease is deemed rejected at

that juncture. See 11 U.S.C. 365(d)(4). This provision gives 

the bankruptcy estate a measure of protection against indecision

or inadvertence on the trustee's part.

These modifications ameliorate, but do not entirely

solve, several of the problems related to tenant bankruptcies

that historically have plagued commercial landlords. One

surviving problem concerns the rampant uncertainty as to whether

a rejection will be deemed effective on the date of the trustee's

decision or only when the court thereafter endorses the decision.

It is to this question that we now turn.

B. When Is A Rejection Effective? B. When Is A Rejection Effective? 

8

The best hope for capturing congressional intent is by

focusing on the language purposefully deployed by the

legislature. Thus, a statute ordinarily will be construed

according to its plain meaning. See Estate of Cowart v. Nicklos 

Drilling Co., 112 S. Ct. 2589, 2594 (1992); In re Jarvis, 53 F.3d 

at 419; Pritzker v. Yari, 42 F.3d 53, 67-68 (1st Cir. 1994), 

cert. denied, 115 S. Ct. 1959 (1995). But, when Congress' words 

admit of more than one reasonable interpretation, "plain meaning"

becomes an impossible dream, and an inquiring court must look to

the policies, principles and purposes underlying the statute in

order to construe it. See Pritzker, 42 F.3d at 67; see also 

Sullivan v. CIA, 992 F.2d 1249, 1252 (1st Cir. 1993) (explaining 

that courts may "look behind statutory language" when the

legislature "blows an uncertain trumpet"). Congress, after all,

does not legislate in a vacuum.

Here, the protagonists assure us that the statutory

language is plain, and that we need not go beyond it. The debtor

says that under section 365(a) the rejection of a nonresidential

lease "plainly" becomes effective on the motion filing date (when

notice of rejection is given), subject to defeasance in the event

a judge later vetoes the trustee's decision. The landlord says

that under section 365(a) the rejection of a nonresidential lease

"plainly" cannot become effective until the court approval date

(when the bankruptcy court places its imprimatur on the

decision). The authorities are divided as to which

interpretation of the statutory language is appropriate. Some

9

courts (albeit a minority) believe that section 365(a) should be

read, as TMC successfully argued in the district court, to align

judicial approval as a condition subsequent to the trustee's

independently effective rejection of a nonresidential lease.

See, e.g., In re Joseph C. Spiess Co., 145 B.R. 597, 604 (Bankr. 

N.D. Ill. 1992); In re 1 Potato 2, Inc., 58 B.R. 752, 755-56 

(Bankr. D. Minn. 1986). Other courts (more numerous, overall)

believe, as Mellon successfully argued in the bankruptcy court,

that section 365(a) should be read to require judicial approval

as a condition precedent to an effective rejection of a

nonresidential lease. See, e.g., In re Paul Harris Stores, Inc., 

148 B.R. 307, 309 (S.D. Ind. 1992); In re Federated Dept. Stores, 

Inc., 131 B.R. 808, 815-816 (S.D. Ohio 1991); In re Swiss Hot Dog 

Co., 72 B.R. 569, 571 (D. Colo. 1987); In re 1 Potato 2, Inc., 

182 B.R. 540, 542 (Bankr. D. Minn. 1995); In re Revco Dept. 

Stores, Inc., 109 B.R 264, 267 (Bankr. N.D. Ohio 1989). No court 

of appeals has ventured to answer the question.4

In our judgment, this collision of viewpoints

underscores the obvious: although the text of section 365(a)

plainly indicates that a trustee's rejection of a nonresidential

 

4Contrary to Mellon's characterization, In re Arizona 
Appetito's Stores, Inc., 893 F.2d 216 (9th Cir. 1989), is not on 
point. There, the Ninth Circuit merely observed that "rejection
of an unexpired lease can be accomplished only by an order of the
bankruptcy court." Id. at 219-20 (dictum). The statement is 
correct as far as it goes but it does not go far enough. The
issue here is not whether court approval is required under
section 365(a) clearly, it is but whether a purported
rejection becomes legally effective before court approval is 
secured.

10

lease is conditional upon court approval, the text is unclear as

to whether that approval constitutes a condition precedent or

subsequent to an effective rejection. Consequently, section

365(a) is ambiguous in this respect. See United States v. 

Gibbens, 25 F.3d 28, 34 (1st Cir. 1994) ("A statute is ambiguous 

if it can be read in more than one way.").

While the competing interpretations proposed by the

parties are both reasonable renditions of the statute's language,

we believe that section 365(a) is most faithfully read as making

court approval a condition precedent to the effectiveness of a

trustee's rejection of a nonresidential lease. Therefore, the

date of court approval, not the motion filing date, controls. We

are guided to this conclusion by several signposts.

First and foremost, we think that the structure of the

Bankruptcy Code and the nature of judicial oversight in the

Chapter 11 milieu combine to make it highly likely that Congress

intended judicial authorization to be a condition precedent to

rejection. Bankruptcy is inherently a judicial process. From

the moment that a debtor's petition is filed in the bankruptcy

court, the debtor's property is in custodia legis. See 1 William 

C. Norton, Jr., Norton Bankruptcy Law and Practice 2d 3:2 

(1994). From that point forward, the bankruptcy court is charged

with overseeing the trustee's management in order to ensure that

the interests of the bankruptcy estate are served. See 4 Norton, 

supra, 77:4. 

Judicial oversight of the reorganization process takes

11

two forms. Many routine decisions are made by the trustee

without any specific clearance from the bankruptcy court, and are

reviewed (if at all) only in the course of an examination of the

trustee's overall stewardship (say, when a plan of reorganization

is proposed or when an application for fees is filed). Other

decisions are not effective unless they are specifically

sanctioned by the court. In those instances, judicial approval

is almost invariably a condition precedent to the trustee's

action.5 Arranging matters in this sequence facilitates

judicial oversight, minimizes false starts, and enhances the

efficiency of the process. We can think of no convincing reason

why Congress would abruptly depart from this tried-and-true

formula. More importantly, we are confident that if Congress

wished to inaugurate so radical a change, it would have taken

pains to mark the trail brightly.

A second reason for reading section 365(a) to require

judicial approval as a condition precedent to rejection of a

nonresidential lease is rooted in history. Congress enacted

section 365(a) as part of the Bankruptcy Code of 1978, making

court approval of such rejections obligatory for the first time.
 

5We note several examples. Before using, selling, or
leasing property of the estate outside the ordinary course of
business, the trustee must seek court approval. See 11 U.S.C.  
363(b)(1). Unless each entity that has an interest in cash
collateral consents, the trustee may not use cash collateral
unless the bankruptcy court first grants authorization. See 11 
U.S.C. 363(2)(A), (B). If the trustee seeks extraordinary
post-petition financing, he must first obtain court approval.
See 11 U.S.C. 364(b). And the trustee may not abandon property 
of the estate, even if burdensome, without obtaining court
approval. See 11 U.S.C. 554(a). 

12

The predecessor to section 365(a), section 70(b) of the

Bankruptcy Act of 1898, 11 U.S.C. 110(b) (repealed 1978), and

the applicable bankruptcy rule governing actions taken pursuant

to section 70(b), Fed. R. Bankr. P. 607 (repealed 1978), did not

explicitly require judicial approval of a trustee's rejection of

a lease, and many courts held that the trustee, acting alone,

could make a rejection stick. See, e.g., Villas & Sommer, Inc. 

v. Mahony (In re Steelship Corp.), 576 F.2d 128, 132 (8th Cir. 

1978). The conclusion is irresistible that Congress, by changing

the protocol in 1978, intended to involve bankruptcy courts more

actively in the decisional process. We believe that this policy

of increased involvement is better served by viewing judicial

approval as a condition precedent to the effectiveness of a

rejection instead of as a condition subsequent.

In a related vein, we note that several courts have

found support for requiring court approval as a condition

precedent to rejection in two extant rules of bankruptcy

procedure, namely, Fed. R. Bankr. P. 6006 and 9014. See, e.g., 

Revco, 109 B.R. at 268. Read together, these rules require a 

trustee who desires to reject a lease to file a formal motion to

that effect. This, too, constitutes an innovation for,

previously, the rules did not provide a formal procedure for

rejecting leases. We think this is another sign that Congress

intended courts to become more involved in the decisional

process, and, thus, reinforces our vision of court approval as a

condition precedent to a valid rejection of a nonresidential

13

lease.

The third reason for our view is that reading the

statute in the manner favored by the district court tends to

reduce a bankruptcy court's order of approval to a bagatelle. So

interpreted, the provision would trivialize judicial oversight of

the rejection process. Court orders are customarily important

events in the life of a judicial proceeding; they are the primary

means through which courts speak, see, e.g., Advance Financial 

Corp. v. Isla Rica Sales, Inc., 747 F.2d 21, 26 (1st Cir. 1984), 

and they should carry commensurate weight. We see no reason for

allowing a trustee to substitute his voice for that of the court.

The trustee may sing all he wants, but it is the court that must

call the tune. Cf. W.A. Mozart, Le Nozze di Figaro, Act 1, sc.2 

(1786) (Figaro's Aria).

Along the same lines, we think that the district

court's "valid, but voidable" construct, see Thinking Machines, 

182 B.R. at 368, is largely bereft of meaning. In the rejection

scenario, the sole reason for seeking court approval is to cut

off the debtor's post-petition liability, imposed by section

365(d)(3), under the unexpired nonresidential lease. If the

bankruptcy court disapproves the trustee's motion for rejection,

then the "rejection" never had any meaningful legal existence in

the first place the trustee will remain liable for rent at the

contract rate from the inception of the insolvency proceeding.

As judicial approval will always be the last step in the

rejection pavane, it follows that the trustee's repudiation of a

14

lease can never be valid in any meaningful sense until the court

has acted.

A final reason for our view stems from a concern that

treating a rejection as "valid, but voidable" from the motion

filing date forward would further ensnarl the tangles inherent in

the complexities of modern commerce. If "valid, but voidable"

were the rule, the parties could act on the trustee's notice, and

their actions would have to be undone if the court later

disagreed. Traditionally, attempts to unwind bankruptcy

transactions after the fact have proven nettlesome, see, e.g., In 

re Stadium Mgmt. Corp., 895 F.2d 845, 849 (1st Cir. 1990); In re 

Texaco, 92 B.R. 38, 50 (S.D.N.Y. 1988), and we will not lightly 

assume that Congress intended to invite these myriad

complications.

This round trip back to the future serves to highlight

the importance of factual certainty in the rejection process. In

adopting a requirement of court approval, Congress overruled

precedent that allowed trustees to show by informal conduct that

they had either assumed or rejected leases (or other executory

contracts, for that matter). Thus, the requirement seems to have

been designed at least in part to remedy the problems attendant

upon informal or equivocal rejections particularly the lack of

clear notice to landlords as to when they could safely redeem and

relet their property. See Gregory G. Hesse, A Return to 

Confusion and Uncertainty as to the Effective Date of Rejection 

of Commercial Leases in Bankruptcy, 9 Bankr. Dev. J. 521, 531 

15

(1993) (discussing legislative history). Treating a trustee's

rejection of a nonresidential lease as "valid, but voidable" tugs

in the opposite direction, promoting uncertainty rather than

dispelling it.6

In an effort to resist the force of these four reasons,

TMC counters with two principal points. First, it notes that the

language used in section 365(a) is atypical. Congress

traditionally employs the vocabulary of prior authorization when

inserting a requirement of court approval in the Code. For

example, the statutes cited in note 5, supra, all say that "the 

court, after notice and a hearing," may authorize particular

actions. TMC visualizes the somewhat different wording of

section 365(a) as betokening a different mechanism. But it is

risky to read too much into Congress' use of an alternative

formulation, especially when the new language is opaque. We are

unwilling, without more, to construe the mere absence of an

explicit reference to securing court approval in advance as an

intentional departure from the pattern of prior court approval

woven throughout the fabric of the Bankruptcy Code.
 

6We do not think that it is any real answer to insinuate
that "valid, but voidable" is workable because a bankruptcy court
will usually support a trustee's desire to scrap an unexpired
nonresidential lease. The magnitude of the harm that a landlord
might suffer if the bankruptcy court subsequently disapproved a
particular rejection after the landlord diligently relet the
rejected premises, or incurred substantial expenses to
rehabilitate or advertise them, brings into focus the potential
unfairness inherent in adopting the motion filing date as the
effective date of a rejection. We have no reason to think that
Congress intended to add an element of Russian roulette to the
already tumultuous effects of the reorganization process on
commercial landlords.

16

Next, TMC complains that using the date of court

approval as the termination date of a nonresidential lease

burdens the scarce resources of bankruptcy estates. In this

respect, section 365(a), in conjunction with section 365(d)(3),

departs from one of the general themes of Chapter 11 in that it

hinders the trustee's efforts to rid the bankruptcy estate of

unnecessary baggage. But general themes are, by definition,

general; they are not necessarily controlling in all specific

instances. Since the S/C Amendments purposefully discounted this

general theme in relation to the specific circumstances presented

by nonresidential leases, TMC's policy argument is best directed

to the legislative, not the judicial, branch.

We need go no further. For the reasons limned above,

we hold that a rejection of a nonresidential lease under section

365(a) becomes legally effective only after judicial approval has

been obtained.

C. Relief Under Section 365(a). C. Relief Under Section 365(a). 

Although we have decided the precise issue presented on

appeal, we think it behooves us to make clear that nothing in our

holding today precludes a bankruptcy court, in an appropriate

section 365(a) case, from approving a trustee's rejection of a

nonresidential lease retroactive to the motion filing date. We

explain briefly.

Bankruptcy courts are courts of equity, see Pepper v. 

Litton, 308 U.S. 295, 304-05 (1939), and, particularly in the 

Chapter 11 context, they may sometimes abandon mechanical

17

solutions in favor of the pliant reins of fairness. See, e.g., 

Winthrop Old Farm Nurseries, 50 F.3d at 75 (explaining that a 

bankruptcy court, applying principles of equity, may in its

discretion choose between valuation methods). In the section 365

context, this means that bankruptcy courts may enter retroactive

orders of approval, and should do so when the balance of equities

preponderates in favor of such remediation. See In re Jamesway 

Corp., 179 B.R. 33, 39 (S.D.N.Y. 1995) (holding that a bankruptcy 

court can order rejection retroactive to an earlier date "to

avoid penalizing the debtor for an unnecessary delay caused by

the creditor"); see also In re Garfinckels, Inc., 118 B.R. 154, 

154 (Bankr. D.D.C. 1990) (suggesting that, in the absence of

unfair prejudice, a bankruptcy court may enter an order nunc pro

tunc setting the motion filing date as the effective date of

approval); see generally 11 U.S.C. 105(a) (authorizing 

bankruptcy courts to "issue any order, process, or judgment that

is necessary or appropriate to carry out the provisions" of Title

11).

Of course, the equitable powers of bankruptcy courts

are not unlimited. They can only be brought to bear in the

service of the Bankruptcy Code. See Norwest Bank, Worthington, 

v. Ahlers, 485 U.S. 197, 206 (1988). Thus, a bankruptcy court's 

exercise of its residual equitable powers must be connected to,

and advance the purposes of, specific provisions in the Code.

See, e.g., In re Hoffman Bros. Packing Co., 173 B.R. 177, 185-86 

(Bankr. 9th Cir. 1994) (invalidating nunc pro tunc order that

18

contradicted an express Code provision). There is little

question, however, that a retroactive order may be appropriate as

long as it promotes the purposes of section 365(a).7

Consequently, we rule that a bankruptcy court, when principles of

equity so dictate, may approve a rejection of a nonresidential

lease pursuant to section 365(a) retroactive to the motion filing

date.8

The fact that the bankruptcy court has the power to

approve the trustee's rejection of an unexpired nonresidential

lease retroactive to the motion filing date has a salutary side

effect; it should act as a stimulus to all parties to cooperate

in getting the trustee's motion to reject heard and determined at

the earliest practicable date. Moreover, the possibility of

retroactivity helps to explain the seeming rift in the case law.

Witness, for example, In re Joseph C. Spiess Co., 145 B.R. 597 

(Bankr. N.D. Ill. 1992), the leading case cited by the district

court in support of its "valid, but voidable" rationale. A close

reading of Spiess indicates that the court may have reached its 

ultimate conclusion that the rejection took effect on the
 

7Retroactive approval orders do not contradict 365(c)(3).
While that provision commands the trustee to pay rent at the
contract rate until a nonresidential lease is rejected, it does
not stipulate that a rejection cannot be made to apply
retroactively. See Jamesway, 179 B.R. at 37. 

8We note, in this connection, that because such retroactive
orders are within the bankruptcy court's sound discretion,
appeals from a bankruptcy court's disposition of a request for
retroactive relief will be reviewed only for abuse of discretion.
See, e.g., Jarvis, 53 F.3d at 420; Grella v. Salem Five Cent Sav. 
Bank, 42 F.3d 26, 30 (1st Cir. 1994); In re Gonic Realty Trust, 
909 F.2d 624, 626 (1st Cir. 1990).

19

motion filing date as opposed to the court approval date on the

basis of equitable, rather than statutory, principles. The

court's actual holding is illuminating. After determining "that

the trustee's rejection of a lease should be retroactive to the

date that trustee takes affirmative steps to reject said lease

such as serving notice on motion to reject," the court held that

a court-approved rejection of an unexpired nonresidential lease

could "apply retroactively to the date the trustee notices the

motion requesting same." Spiess, 145 B.R. at 606. Thus, Spiess 

can fairly be read as an instance of a bankruptcy court

recognizing that retroactive approval orders are within its

equitable powers under section 365(a), and acting on that

realization.

Reading Spiess in this manner bridges the apparent 

conflict in the case law. Doctrinal incoherence vanishes, and a

single black-letter rule emerges: rejection under section 365(a)

does not take effect until judicial approval is secured, but the

approving court has the equitable power, in suitable cases, to

order a rejection to operate retroactively.9

IV. CONCLUSION IV. CONCLUSION

We reverse the decision of the district court, vacate

its order, and direct that it remand the matter to the bankruptcy

court (which, if it so elects, may in its discretion reconsider

 

9Because no two cases are exactly alike, we eschew any
attempt to spell out the range of circumstances that might
justify the use of a bankruptcy court's equitable powers in this
fashion. That exercise is best handled on a case-by-case basis.

20

its original order in light of this opinion).

The judgment of the district court is reversed, and the The judgment of the district court is reversed, and the 

cause is remanded to the district court with instructions to cause is remanded to the district court with instructions to 

remit the case to the bankruptcy court. Costs in favor of remit the case to the bankruptcy court. Costs in favor of 

appellant. appellant. 

21