**In re HANDY & HARMAN REFINING GROUP, INC., Attleboro Refining Company, Inc., Debtors.**

Nos. 00–20845, 00–20846.

United States Bankruptcy Court, D. Connecticut.

May 9, 2001.

For subsequent decision on motion, see 2001 WL 867431.

James L. Adler, U.S. Mint Office of Chief Counsel, Washington, DC, Elias A. Alexiades, Hurwitz and Sagarin, PC, Milford, CT, L.J. Arnold, III, Obrien, Shafner, et al., Norwich, CT, Jane W. Arnone, Benanti and Associates, Stamford, CT, Elizabeth J. Austin, Pullman and Comley, Bridgeport, CT, Brenda A. Bachman, Pension Benefit Guaranty Corp., Office of General Counsel, Washington, DC, Jeffrey S. Bagnell, Garrison, Phelan & Assoc., New Haven, CT, Anne E. Beaumont, Boies, Schiller & Flexner, LLP, Armonk, NY, Thomas G. Benneche, Simsbury, CT, Peter W. Benner, Shipman and Goodwin, Hartford, CT, Raymond C. Bliss, Baker O'Sullivan & Bliss PC, Wethersfield, CT, Elise Busny, Brown, Rudnick, Freed and Gesmer, Boston, MA, David G. Chabot, Krasow, Garlick and Hadley, LLC, Hartford, CT, Lewis H. Chimes, Garrison, Phelan, Levin-Epstein, Chimes and Richardson, New Haven, CT, Marjorie Sommer Cooke, Cooke, Clancy & Gruenthal, LLP, Boston, MA, Mark Cramer, Cramer & Alissi, LLC, Hartford, CT, Patrick Crook, Witherspoon Law Offices, Farmington, CT, Melinda M. Decker, Halloran & Sage, Hartford, CT, Michael R. Enright, Robinson and Cole, Hartford, CT, Douglas M. Evans, Kroll, McNamara & Evans, West Hartford, CT, Thomas J. Farrell, Hunt Leibert Chester & Jacobson, Hartford, CT, Barry S. Feigenbaum, ROgin, Nassau, Caplan, Lassman, et al., Hartford, CT, Todd Feinsmith, Brown, Rudnick, Freed and Gesmer, Boston, MA, Richard C. Feldman, Evans, Feldman & Boyer, New Haven, CT, Carol Al. Felicetta, New Haven, CT, William S. Fish, Tyler, Cooper, and Alcorn, Hartford, CT, Marianne L. Fisher, East Windsor Hill, CT, Terrence J. Galligan, Cooke, Clancy & Gruenthal, LLP, Boston, MA, Linda Clifford Hadley, Krasow, Garlick and Hadley, LLC, Hartford, CT, Barbara L. Hankin, Westport, CT, Robin A. Henry, Boies, Schiller & Flexner, LLP, Armonk, NY, Jed Horwitt, Zeisler and Zeisler, Bridgeport, CT, John B. Hughes, Asst. U.S. Attorney, Connecticut Financial Center, New Haven, CT, Mark R. Jacobs, Jacobs Partners LLC, Norwalk, CT, Seth Jacoby, Purtill, Purtill and Pfeffer, South Glastonbury, CT, Derek M. Johnson, Ruben, Johnson and Morgan, Hartford, CT, Michael J. Jones, Ivey Barnum and O'Mara, Greenwich, CT, Mitchell J. Levine, Nair & Levine, Bloomfield, CT, Jennifer London, Shipman & Goodwin LLP, Hartford, CT, Thomas S. Marrion, Tyler, Cooper and Alcorn, Hartford, CT, Deirdre A. Martini, Ivey, Barum & O'Mara, LLC, Greenwich, CT, Matthew J. McGowan, Krasow, Garlick & Hadley, Hartford, CT, Thomas Meiklejohn, Livingston, Adler, Pulda & Meiklejohn, PC, Hartford, CT, Kevin Murphy, Nixon Peabody LLP, Hartford, CT, Roberta Napolitano, Weinstein, Weiner, Ignal, Napolitano & Shapiro, PC, Bridgeport, CT, Ann M. Nevins, Asst. U.S. Attorney's Office, Bridgeport, CT, Gregory W. Nye, Bingham Dana LLP, Hartford, CT, Paul F.

O'Donnell, III, Hinckley, Allen & Snyder, Boston, MA, John J. O'Neil, Jr., Francis O'Neil Del Piano, Hartford, CT, Richard M. Peirce, Roberts, Carroll, Feldstein & Peirce, Providence, RI, Rita Provatas, Tobin, Joseph J. Selinger, Jr., Carberry, O'Malley, Riley, et al., New London, CT, Alan B. Silver, Hartford, CT, Jonathan Starble, Rogin, Nassau, Caplan, Lassman, et al., Hartford, CT, Susan M. Williams, Enfield, CT, Matthew H. Youmans, Levin, Ford & Paulekas, LLP, Hartford, CT, Steven M. Zelman, Albrecht & Zelman, Bloomfield, CT, for creditors.

Eric A. Henzy, Jon P. Newton, Reid and Riege, P.C., Hartford, CT, for debtors.

Bill Garey, Wel-Met Corporation, Cranston, RI, pro se.

Ellis Brown, Mid-States Recycling, Inc., Des Plaines, IL, pro se.

## RULING ON MOTION FOR PARTIAL JUDGMENT, PURSUANT TO FED. R. CIV. P. 52(c) [1]

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

### I.

The motion before the court arises out of a proceeding brought by a Chapter 11 debtor-in-possession to estimate, pursuant to Bankruptcy Code § 502(c) [2], a creditor's unliquidated claim for the imposition of a constructive trust "at zero" for purposes of allowance ("the estimation motion"). After the debtor presented its witnesses, requiring, with extensive cross-examination, four days of trial, the debtor and the creditors' committee (together, "the movants") jointly filed the instant motion. The motion asserts that continuing the estimation hearing will require at least six more trial days for eight witnesses identified by the creditor; that the creditor "has no evidence to contradict" the debtor's basis for estimating the creditor's constructive trust claim at zero; and that such proposed lengthy continuation of the hearing will cause substantial legal and other expenses to the debtor's estate and an unconscionable delay for a proposed immediate partial dividend distribution to over 800 estate creditors. The estimation hearing is being held jointly with a contested confirmation hearing on the insolvent debtor's plan of reorganization—a plan of liquidation of the debtor's assets.

### II.

Handy & Harman Refining Group, Inc. ("the debtor"), on March 28, 2000, filed a petition for relief under Chapter 11 of the Bankruptcy Code. The debtor had been formed in 1996, together with a wholly-owned subsidiary, Attleboro Refining

---

1. Rule 52(c), made applicable in bankruptcy proceedings by Fed. R. Bank. P. 7052(c), provides as follows:

   (c) *Judgment on Partial Findings.* If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim, that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

2. Section 502(c) provides:

   (c) There shall be estimated for purpose of allowance under this section—
      (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
      (2) any right to payment arising from a right to an equitable remedy for breach of performance.

Company, Inc. ("ARC")[3]. Together, they allegedly became one of the largest refiners of precious metals (primarily, gold and silver) in the world.[4] The debtor's refinery, located in South Windsor, Connecticut, performed so-called "intermediate refining—receiving from customers materials that normally contained a relatively small portion of precious metals and extracting these metals. Intermediate refining typically required additional processing, either by smelters or by 'final refiners.'" The debtor owned a "final refinery" facility located in Attleboro, Massachusetts. ARC, under a lease from the debtor, operated the final refinery. The debtor either owned or held stock in refineries located in two other states, in Canada and in Singapore.

In February, 2000, the debtor discovered that some $14,000,000 of its gold located in Peru was missing. This event had serious consequences. Two entities providing funding for the debtor's and ARC's operations, on March 7 and March 8, 2000, terminated their funding. The debtor also was experiencing a serious shortfall of precious metals on hand for delivery to some 400 metal customers. The debtor and ARC, on March 28, 2000, filed Chapter 11 bankruptcy petitions, and the court has ordered the two estates to be jointly administered. Only the debtor has filed a plan of reorganization.

The United States Mint ("the Mint") was one of the debtor's major customers and had delivered silver bars to the debtor for final refining. The Mint, on September 21, 2000, filed a proof of claim in the debtor's estate for $13,474,836.55 as representing some 2,660,382.34 ounces of silver ("the Mint silver") which it had delivered to the debtor by January, 2000.[5] The proof of claim included the following statement: "This claim is filed as unsecured without waiving ownership claims to preserve all rights and without making any admission whatsoever."

On March 2, 2000, the Mint filed an eight-count complaint in this court against the debtor, Fleet National Bank and Fleet Precious Metals, Inc. (together, "Fleet") and others ("the Fleet complaint") alleging that the debtor had wrongfully delivered to Fleet 521,098.98 ounces of the Mint silver, worth $2,636,760.84. The Mint sued Fleet for conversion, unjust enrichment and for imposition of a constructive trust against Fleet. In Count Three of the complaint, the Mint sought "the imposition of a constructive trust for the benefit of the government on the assets of [the debtor] in an amount equal to the consideration which [the debtor] received from any sale by it of the [Mint silver], or, in an amount equal to the value of the [Mint silver]...."

The Mint, simultaneously, filed a like nine-count complaint against the debtor, Credit Suisse First Boston International ("Credit Suisse") and others, alleging that the debtor had wrongfully sold 2,139,-833.36 ounces of the Mint silver, worth $10,824,773.80, to ARC, and then sold by ARC to Credit Suisse ("the Credit Suisse complaint"). Count Eight of this complaint seeks the imposition of a constructive trust on the debtor's assets, using

---

**3.** Golden West Refining Corporation Limited, an Australian company, is the corporate parent of the debtor.

**4.** The debtor's disclosure statement claims the debtor and ARC annually refined over $1 billion in precious metals.

**5.** This amount is actually the balance of silver delivered by the Mint as the debtor, on March 23, 2000, returned to the Mint approximately 2.7 million ounces of silver prior to refining. Between January and March 28, 2000, the debtor transferred to the Mint approximately 1.8 million ounces of refined silver.

language identical to Count Three of the Fleet complaint.

Fleet and Credit Suisse were the two entities providing the pre-petition funding for the debtor's and ARC's operations. Under their complex arrangements, the debtor or ARC sold precious metal to them and then repurchased the metal after final refining. After the commencement of the debtor's bankruptcy case, the court, on May 12, 2000, after notice and hearing, entered two orders granting Fleet and Credit Suisse relief from the automatic stay to remove metal, allegedly purchased by them from ARC or the debtor, from the debtor's and ARC's premises, on the condition that Fleet and Credit Suisse remain subject to the jurisdiction of the bankruptcy court for proceedings against them, filed by a stated bar date, by any of the debtor's customers who chose to assert title or other claims against either of them. The Mint timely filed the Fleet and the Credit Suisse complaints in accordance with these orders. It is the debtor's liability under the constructive trust counts contained in these complaints that the debtor seeks to have the court estimate under § 502(c) for the purpose of distribution if the debtor's plan is confirmed. The unsecured claims filed in the debtor's estate total approximately $54,000,000, and if the debtor must reserve for the Mint's constructive trust claim of $13,000,000, no immediate dividend is feasible, in light of other necessary reserves. A number of other creditors have filed complaints against Fleet and Credit Suisse asserting title claims.

## III.

### A.

■ "Section 502(c) provides a mechanism for estimating the amount of a contingent or unliquidated claim for the purpose of its allowance where the actual liquidation of the claim as determined by the court would unduly delay the administration of the case." 4 *Collier's on Bankruptcy* ¶ 502.04(1) (15th ed.2001). Since the Bankruptcy Code and the Bankruptcy Rules are silent on the manner in which claims are to be estimated, bankruptcy judges are to use "whatever method is best suited to the particular contingencies at issue.... [W]here there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value." *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3d Cir.1982).

The Mint does not contest the propriety of the filing of the estimation motion concerning the Mint's claim for a constructive trust. It objects to the finding of a zero value. The Mint, on March 22, 2001, filed a like motion under § 502(c) to have the court estimate the Mint's "claim for voting purposes and purposes of establishing a disputed claim reserve." (Motion ¶ 1.) The Mint requested an estimation of the claim of $13,474,836.55.

### B.

■ During the hearing on the estimation motion, it became obvious that the debtor and the Mint differed on the interpretation of the contract under which the Mint delivered the Mint silver to the debtor. For the purpose of the instant motion, the movants have accepted the Mint's interpretation of the contract—namely, that a *bailment* of the Mint silver was intended upon its delivery to the debtor, not as the debtor contends, a sale of the silver, pursuant to industry-wide practices. Under this construction of the contract, the movants concede that the sale of the Mint silver to Fleet and Credit Suisse was wrongful and in violation of the contract. The movants also stipulated that any findings of fact and conclusions of law of the court on the

instant motion shall have no collateral estoppel effect on any issues in the pending Fleet and Credit Suisse adversary proceedings, where the parties will not be ready for trial for many months.[6]

At the heart of the instant motion is the claim by the movants that there admittedly is no Mint silver at either of the debtor's premises or in control of the debtor, and no proceeds of the sale of the Mint silver in the debtor's bank accounts. The Fleet and Credit Suisse complaints are founded on the Mint's allegation that its silver was wrongfully sold to Fleet and Credit Suisse. The testimony of the debtor's witnesses is to the effect that while the debtor presently has $20 million cash on hand, which it proposes upon plan confirmation to distribute as a partial dividend, none of it resulted from the transfer of the Mint silver to Fleet or to Credit Suisse or to anyone else. In short, the movants argue that the court, as a matter of law, cannot impose a constructive trust *on all of the debtor's assets* when the Mint, as the bailor, cannot trace any of its property into a product presently in the hands of the debtor, the bailee. *See United States v. Benitez,* 779 F.2d 135, 140 (2d Cir.1985) citing *A. Scott on Trusts* § 521 (3d ed. 1967) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer.").

### C.

At the end of the fourth day of the hearing on the estimation motion, the movants orally raised the idea of the filing of the instant motion. Since this suggestion came after the debtor had put on its case, and before the Mint had the opportunity to present any of its material witnesses[7], the propriety of such a motion initially appeared incongruous to the court. However, after further conversation on the record, when it seemed that none of the Mint's prospective witnesses would be testifying on the issue of tracing the Mint silver, counsel for the Mint commented that "it may be that that [the instant motion] would be an appropriate vehicle to present to your Honor." (Transcript of 4/18/01 at 196.) The court thereupon established dates for the movants to file the instant motion, the parties to submit their briefs and for a hearing. The Mint reserved all objections until it received the movants' written motion.

■ In its subsequent brief and during the April 27, 2001 hearing on the instant motion, the Mint opposed the instant motion as premature, asserting that it will seek to locate and call as witnesses present or former employees of the debtor or ARC. The Mint stated it intends to acquire evidence in order to support the application of the "intermediate balance rule" to the "customer metal pool account." This rule, customarily applied to a bailee's bank account, permits a court "to follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust funds." *In re Drexel Burnham Lambert Group,*

---

6. Fleet also endorsed this stipulation. *See In re Bicoastal Corp.,* 122 B.R. 771, 775 (Bankr. M.D.Fla.1990) ("Estimation of claims in bankruptcy does not establish a binding legal determination of ultimate validity of claims nor a binding determination of any issues."); *cf. United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co., Inc.),* 259 B.R.

458, 465 (1st Cir. BAP 2001) ("an estimated claim may be limited by the court in deference to another court's jurisdiction over a matter.").

7. Three witnesses of the Mint were briefly heard, by agreement, during the debtor's case.

142 B.R. 633, 636 (S.D.N.Y.1992).[8]

In a later memorandum, the Mint unequivocally states that "it has" witnesses regarding "the factual questions underlying the application of the intermediate balance rule." (Mint Mem. of 4/30/01.) The Mint does not disclose the content of such testimony.

The court has noted the movant's citation to *In re Omegas Group, Inc.*, 16 F.3d 1443, 1452 (6th Cir.1994) for the proposition that "constructive trusts are an anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the debtor...." On the record made to date, the court would have no difficulty granting the debtor's instant motion, and holding the Mint cannot impose a constructive trust on all the debtor's assets to the extent of the amount of the Mint's proof of claim.

Nevertheless, the court believes it would be an abuse of its discretion to prevent the Mint from promptly presenting its evidence, limited to the issue of tracing the Mint's silver. The movants have cited no decisional authority, and the court has located none, supporting the granting of the instant motion at this stage of the hearing in light of the Mint's representations.

### IV.

Accordingly, a ruling on the instant motion is deferred until the close of evidence, and a trial date shall be scheduled for the Mint to present its evidence limited to the tracing of Mint silver, or its proceeds, into the present possession of the debtor. The Mint will immediately deliver the name(s) of its witness(es); with a description of the

content of the testimony, to the movants. It is

SO ORDERED.

---

8. The Mint's brief discusses other grounds for denying the instant motion, none of which the court finds sufficiently relevant to warrant discussion. They include the Mint's right to a jury trial in its adversary proceedings, issues having to do with plan confirmation and the fear of collateral estoppel effect in other adversary proceedings.